Filed 4/28/23  P. v. Lopez CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>DAVID LOPEZ,<br><br>        Defendant and Appellant. | B314158<br><br>(Los Angeles County<br>Super. Ct. No. BA480221) |

        APPEAL from a judgment of the Superior Court of Los Angeles County, Renee Korn, Judge.  Affirmed as modified.

        Gary V. Crooks, under appointment by the Court of Appeal, for Defendant and Appellant.

        Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and David A. Voet, Deputy Attorneys General, for Plaintiff and Respondent.

—————————————————

David Lopez appeals from a judgment entered after a jury found him guilty of two counts of criminal threats with personal use of a deadly or dangerous weapon (a knife) and three counts of assault with a deadly weapon (the knife). After Lopez admitted he had a prior strike conviction, the trial court sentenced him to six years in prison. He raises numerous contentions on appeal, including (1) the prosecution failed to prove he did not act in self-defense, (2) the court gave the jury "misleading" and "confusing" instructions on self-defense and the weapon enhancement, (3) the court erred in answering a question from the jury, and (4) the court erred in imposing a restitution fine and assessments without considering his ability to pay. For the reasons explained below, we affirm the judgment, as modified to correct clerical errors regarding assessments the trial court imposed.

## BACKGROUND

### I. Evidence of the Facts and Circumstances of the Crimes as Presented at Trial

At night, on August 7, 2019, Paula Farfan, her friend Luzangela Zelaya, Zelaya's boyfriend Jeffrey Hernandez, and Hernandez's friend Pepe went to a bar.[1] They drank alcohol there and left after around an hour and a half. They walked to the parking lot where Zelaya's car was parked, with Hernandez and Pepe each holding a skateboard. Defendant Lopez and his friend (who was not identified at trial) were in a smoking area outside the bar that was separated from the parking lot by

---

[1] Farfan, Zelaya, and Hernandez testified at trial for the prosecution. The defense did not present any witnesses. The identity of Hernandez's friend was not established at trial. Zelaya testified that the friend used the nickname Pepe, so we will refer to him by that name in this opinion.

fencing with a gate. An interaction and altercation between the two groups was captured on surveillance video from the bar that the prosecution played for the jury during the testimony of Farfan, Zelaya and Hernandez. We have reviewed the surveillance video.

According to the witnesses' testimony, Zelaya walked up to the fence and asked defendant Lopez and his friend for a cigarette. Hernandez also asked someone behind the fence about a vehicle that was blocking Zelaya's car from exiting the parking lot. Hernandez walked away, toward Zelaya's car. Farfan walked over to the fence to see what Zelaya was doing. Farfan and Lopez introduced themselves to each other while Zelaya talked to Lopez's friend. Lopez asked Farfan for her telephone number, which she declined to provide, telling him she would give him contact information for her Instagram account instead. According to Farfan, Lopez became angry and made a "snap comment" back to her, and she walked away. She went to Zelaya's car and put her purse inside. Meanwhile, either Lopez or his friend offered Zelaya the cigarette he was smoking and joked that he had the herpes virus. This upset Zelaya and she returned the cigarette. In response, Lopez or his friend called Zelaya a "bitch."[2] Zelaya walked over to her car where Farfan was waiting.

---

[2] According to Zelaya's trial testimony, this exchange regarding the cigarette, including use of the derogatory term, was between her and Lopez. Hernandez also testified at trial that it was Lopez who referred to Zelaya by the derogatory term. According to Farfan's trial testimony and Zelaya's preliminary hearing testimony (which the defense used to impeach Zelaya), the exchange regarding the cigarette, including use of the derogatory term, was between Zelaya and Lopez's friend. This

Upon overhearing this exchange, Hernandez approached Lopez and his friend (from the other side of the fence) and told them not to be disrespectful and not to call Zelaya a "bitch." Then, Hernandez walked away, toward Zelaya's car. Lopez and his friend came around the fence into the parking lot and approached Hernandez and Pepe. It appeared to Hernandez that Lopez and his friend were mad and wanted to fight with Hernandez. Lopez or his friend grabbed the skateboards away from Hernandez and Pepe, and words were exchanged between the two groups of men. Pepe took the skateboards back.

Lopez grabbed Hernandez, and Hernandez "pushed him away warning him, like, dude, don't. Just stop. Leave. I'll really do something." Hernandez stated at trial that he "held [him]self" back because Lopez was "not worth it." He did not want to engage in a physical altercation because he was on probation (for a robbery), and he would get in trouble if he fought.[3] Hernandez retrieved his skateboard (presumably from Pepe). He stated that he did not use it as a weapon. Zelaya pushed one of the men (Lopez or his friend) away from Hernandez because she did not want Hernandez to fight.[4] Lopez pulled out a knife, held it down at his side, and moved within an inch of Hernandez. Hernandez

inconsistency is not material to our resolution of the issues on appeal.

[3] Between the time of the incident and trial, Hernandez was convicted for a domestic violence incident with Zelaya. They were no longer dating at the time of trial and a protective order prohibited them from having contact with each other.

[4] During her trial testimony, Zelaya sometimes used the words "he" and "him," without specifying whether she was referring to Lopez or his friend.

backed up.[5]  Hernandez testified that he swung his skateboard at Lopez but did not hit him with it, knowing that he could act in self-defense to save his life.[6]  He was angry at that point about the situation and was concerned about Zelaya and Farfan.  He shoved Lopez, and Lopez's friend separated them.  Hernandez took off his shirt in preparation for a fight because he did not want the blade to get caught on his shirt if Lopez tried to strike him with the knife.  Hernandez testified that he did not start the fight.

At some point during the altercation between Hernandez and the two men, Farfan told Lopez "to stop harassing [her] friends."  According to Farfan's trial testimony, Lopez came within 12 to 18 inches of her, looked directly into her eyes, and pointed the knife at her as he threatened to rape and kill her.  Lopez's friend held him back as he moved toward her.  She was scared and believed Lopez would carry out the threats based on his actions.  At trial, the prosecutor showed Farfan a knife, and she identified it as the knife Lopez used.  As the prosecutor played the surveillance video during her testimony, Farfan noted the video depicted the point when she leaned back because Lopez

_____

[5] At trial, the parties agreed the knife could not be seen on the video.  As Hernandez watched the video on the stand, he testified that the reason he backed up as depicted in the video is because he saw the knife for the first time.

[6] Later in his testimony, Hernandez stated he did not recall if he had his skateboard in his hand at this point in the altercation.  At some point, he placed the skateboard in the trunk of Zelaya's car.  The parties agreed at trial that the video does not show Hernandez swinging his skateboard at Lopez (or using it during the altercation).

pointed the knife at her. Farfan testified that she did not initiate an altercation with Lopez.

According to Zelaya's trial testimony, around the same time Lopez threatened Farfan, Lopez looked Zelaya in the face and threatened to kill her and rape her mother, with the knife raised above his head and pointed toward the ground. Lopez was around 12 to 18 inches away from Zelaya when he made these threats and waved the knife.[7] Lopez's friend was holding him back. Zelaya felt "scared for [her] life." At trial, the prosecutor showed Zelaya a knife, and she identified it as the knife Lopez used. Zelaya testified that she did not do anything to provoke Lopez's conduct.

Farfan was standing behind Zelaya's car after Lopez threatened her. Thereafter, she walked around to the passenger side, opened the car door, and retrieved her purse. She removed a knife she carried in her purse and showed it to Lopez.[8] She told him to stop, but he continued threatening to rape and kill her as he held his knife. She told him that if he hurt her, she would hurt him.

Around 30 seconds later, Farfan took out her cell phone and dialed 911 to report the incident. The prosecutor played the audio of the 911 call at trial, and the court marked for identification a transcript of the call. The 911 operator told

---

[7] At trial, Zelaya and Farfan each demonstrated the distance between herself and Lopez at the time Lopez pointed the knife and made the threats and, in each instance, the trial court estimated the distance as 12 to 18 inches.

[8] At trial, the parties agreed that neither the knife Farfan testified she displayed, or the knife witnesses testified Lopez used, could be seen on the bar's surveillance video.

Farfan to find a safe place, and Farfan entered the front passenger seat of Zelaya's car. Zelaya got into the driver's seat and Hernandez and Pepe climbed into the backseat. As reflected in a portion of the transcript of the 911 call, which the prosecutor read into the record, Farfan informed the operator, "He is literally coming at me right now. Oh my god, oh my god, oh my god, no." According to Farfan's trial testimony, at this point, Lopez opened the car's front passenger side door and tried to pull her out of the car. She resisted, pulling away from him. She believed she saw the knife in his hand but was not positive.[9] Hernandez testified that he exited the car, grabbed his skateboard from the trunk, and swung it toward Lopez to get Lopez to back up. Hernandez did not hit Lopez with the skateboard.[10]

Los Angeles Police Department Officer Julio Aguilar, who testified at trial, was on patrol near the bar where this incident occurred. As he and his partner drove by in their patrol car, Aguilar noticed a physical altercation in the bar's parking lot. Aguilar parked the car and exited. He heard people shouting,

_____

[9] When Farfan spoke to an officer at the scene that night, she told the officer that Lopez opened the car door and tried to grab her, but she did not believe he actually touched her. At trial, after seeing the surveillance video, she recalled that Lopez grabbed her and tried to pull her out of the car. Zelaya and Hernandez testified at trial that Lopez actually pulled Farfan out of the car, but Farfan testified that she remained in the car. Again, such inconsistency is not material to our resolution of the issues on appeal.

[10] As stated above, the parties agreed at trial that the video does not show Hernandez ever swinging his skateboard at Lopez.

" 'He's trying to stab me. He's got a knife.' " They pointed toward a man (later identified as Lopez). Lopez ran away, entering the rear door of the bar and exiting out the front. Aguilar walked to the corner and saw Lopez running. Aguilar ordered Lopez to stop, but Lopez continued to run. Aguilar broadcast Lopez's description and location over his radio.

Officer Aguilar walked back to the bar's parking lot and interviewed witnesses. Zelaya stated at trial that she believed she was the "most clearheaded" of her group to tell the officers what happened. She tried to hide from the officers the fact that she had been drinking alcohol that night. As Farfan was speaking to officers, Zelaya covered Farfan's mouth and told Farfan to be quiet when Farfan indicated she (Farfan) was drunk and did not know what was happening. Aguilar interviewed Farfan separately, and Farfan disputed Zelaya's account that Lopez grabbed Farfan and pulled her out of the car. No one told the police that Farfan had a knife. At trial, Farfan stated she was "buzzed" but "lucid" during the incident.

Officer Emanuel Ramirez, who testified at trial, was on patrol when he heard a radio call regarding the description and general location of a suspect in an assault with a deadly weapon. He and his partner responded and drove around, searching for the suspect. Ramirez noticed a man (later identified as Lopez) moving quickly through the parking lot of a shopping center. Ramirez saw Lopez discard an unknown object. Lopez entered a liquor store, and Ramirez and his partner detained him. Ramirez smelled the odor of alcohol and believed Lopez was under the influence. According to Ramirez, Lopez did not have any trouble walking.

Officer Lawrence Langer, who also testified at trial, assisted with the investigation after Lopez was detained. Officer Ramirez asked Langer to search the area for the item Lopez discarded. Langer observed a tall structure with a grate on top and noticed an item on it. He climbed onto the roof of a patrol vehicle in order to view the item. It was a knife, which was then photographed as it sat on top of the grate. The photographs were admitted into evidence. At trial, Langer opened a sealed envelope and identified its contents as the knife he recovered from the top of the structure. He could not recall if the knife was rusty when he found it, but he recalled that the knife did not appear "worn out" and it did not seem like the knife had been on top of the structure for a long time. The prosecutor asked him if he polished or cleaned the knife before collecting it as evidence, and he said no.

Officer Aguilar interviewed Lopez at a police station. The prosecutor played a DVD recording of the interview for the jury, and a transcript of the interview was marked for identification. Aguilar testified that Lopez appeared intoxicated at the time of the interview. Lopez told Aguilar that he was not present at the bar when the incident occurred.

## II.    Verdicts and Sentence

The jury found Lopez guilty of two counts of criminal threats (Pen. Code,[11] § 422, subd. (a)), count 1 against Farfan and count 2 against Zelaya, and found true as to each count the special allegation that Lopez personally used a deadly or dangerous weapon (the knife) in the commission of the criminal

---

[11] Undesignated statutory references are to the Penal Code.

9

threats (§ 12022, subd. (b)(1)).[12]  The jury also found Lopez guilty of three counts of assault with a deadly weapon (§ 245, subd. (a)(1); counts 4-6) against Farfan, Zelaya, and Hernandez.

Lopez waived a jury trial on prior conviction allegations and admitted that a prior conviction for assault with a deadly weapon constituted a strike (§§ 667, subd. (d) & 1170.12, subd. (b)) and a serious felony (§ 667, subd. (a)).  On March 11, 2020, the trial court sentenced him to six years in prison:  the low term of two years for the assault with a deadly weapon on Farfan (count 4), doubled to four years for the prior strike, plus one year (one-third the middle term) for the assault with a deadly weapon on Zelaya (count 5), and one year for the assault with a deadly weapon on Hernandez (count 6).  The court exercised its discretion and dismissed the prior strike as to counts 5 and 6.  The court imposed and stayed the terms on counts 1 and 2 for the criminal threats.  Without objection from Lopez the trial court imposed the minimum restitution fine of $300, as well as court facilities (Gov. Code, § 70373) and court operations (§ 1465.8) assessments on the convictions.

On June 29, 2020, while Lopez was awaiting transfer from county jail to state prison, the trial court granted Lopez's motion for release on his own recognizance due to the COVID-19 pandemic.  The court allowed Lopez to continue to work as a chef during the time he was released.  The court stayed his sentence pending a future hearing.  The parties and the court agreed there would be no change to the sentence imposed on March 11, 2020, unless he failed to appear as ordered.  At hearings on October 26,

---

[12] The trial court dismissed count 3 for criminal threats against Hernandez after the prosecution's case-in-chief.

10

2020, January 15, 2021, and March 15, 2021, the court continued Lopez's release. Lopez continued to work as a chef at two different restaurants. At a hearing on May 24, 2021, Lopez surrendered to custody. He had a total of 873 days of custody credit. As agreed, the court stated there would be no change to the sentence the court announced on March 11, 2020, as specified above.

## DISCUSSION

### I. The Record Includes Substantial Evidence Supporting a Finding That Lopez Did Not Act in Self-Defense

At trial, Lopez's counsel argued to the jury that Lopez acted in self-defense. The trial court instructed the jury on that theory over the prosecution's objection that the evidence did not support it. On appeal, Lopez contends the prosecution presented insufficient evidence for the jury to conclude beyond a reasonable doubt that he did not act in perfect self-defense. In support of this contention, he cites bits and pieces of evidence, taken out of context and viewed in a light most favorable to him, in contravention of the standard of review. Applying the substantial evidence test, as set forth below, we must reject Lopez's challenge to the sufficiency of the evidence.

"It is the prosecution's burden in a criminal case to prove every element of a crime beyond a reasonable doubt. [Citation.] To determine whether the prosecution has introduced sufficient evidence to meet this burden, courts apply the 'substantial evidence' test. Under this standard, the court 'must review the whole record in the light most favorable to the judgment below to determine whether it discloses *substantial* evidence—that is, evidence which is reasonable, credible, and of solid value—such

11

that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.] The focus of the substantial evidence test is on the *whole* record of evidence presented to the trier of fact, rather than on ' "isolated bits of evidence." ' " (*People v. Cuevas* (1995) 12 Cal.4th 252, 260-261.)

We " ' "must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' " (*People v. Smith* (2005) 37 Cal.4th 733, 739.) "The credibility of witnesses and the weight accorded the evidence are matters within the province of the trier of fact." (*People v. Ramos* (2004) 121 Cal.App.4th 1194, 1207.) " 'An appellate court must accept logical inferences that the jury might have drawn from the evidence even if the court would have concluded otherwise.' " (*People v. Halvorsen* (2007) 42 Cal.4th 379, 419.) "Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

As the trial court instructed the jury, to prove Lopez was guilty of assault with a deadly weapon, one of the elements the prosecution had to prove is Lopez did not act in self-defense. (CALCRIM No. 875; *People v. Saavedra* (2007) 156 Cal.App.4th 561, 571 ["the prosecution has the burden to prove a defendant did not act in self-defense, because self-defense negates an element of the offense"].) The trial court also instructed the jury with CALCRIM No. 3470 that "[s]elf-defense is a defense to assault with a deadly weapon (Counts 4, 5, and 6) and the lesser crime of assault. The defendant is not guilty of that crime if he used force against the other person in lawful self-defense. The defendant acted in lawful self-defense if: [¶] 1. The defendant

12

reasonably believed that he was in imminent danger of suffering bodily injury or was in imminent danger of being touched unlawfully; [¶] 2. The defendant reasonably believed that the immediate use of force was necessary to defend against that danger; [¶] AND [¶] 3. The defendant used no more force than was reasonably necessary to defend against the danger." (CALCRIM No. 3470; see also *People v. Minifie* (1996) 13 Cal.4th 1055, 1064-1065; *People v. Humphrey* (1996) 13 Cal.4th 1073, 1082-1083.)

After hearing the victims' testimony and watching the altercation unfold on the bar's surveillance video, the jury rejected Lopez's self-defense theory. On appeal, Lopez asks us to reweigh the evidence and reappraise victim credibility, which we are not permitted to do under the standard of review.

As a threshold matter, Lopez challenges the credibility of evidence demonstrating he had a knife, although each victim testified to this fact and Farfan and Zelaya identified at trial the knife Officer Langer recovered from the area where Officer Ramirez saw Lopez discard an item. The witnesses' testimony constitutes substantial evidence demonstrating Lopez had a knife. The credibility of the testimony was a matter for the jury to evaluate and resolve.

Lopez points to isolated bits of witness testimony and asks us to view those pieces of evidence, and their chronology, in a light most favorable to him. He presents a theory that, if he pulled out a knife and "did an act with [it] that by its nature would directly and probably result in the application of force to a person" (CALCRIM No. 875), he did so because Hernandez used the skateboard as a weapon against him and Farfan threatened him with her knife. Therefore, he argued he acted in self-defense.

13

Lopez cites to Hernandez's testimony indicating Hernandez grabbed his skateboard before Lopez pulled out the knife. Hernandez clarified throughout his testimony, however, that he did not swing the skateboard at Lopez until after Lopez pulled out the knife. It was for the jury to decide whether Lopez pulled out the knife because of Hernandez's actions with the skateboard and, if so, whether Lopez acted in self-defense. The jury resolved these factual questions against Lopez, and we have no cause to disturb the jury's verdicts.

Lopez asserts there is testimony indicating Farfan was carrying her purse (containing her knife) during the entire incident, and she did not retrieve her purse from the car after Lopez threatened her with a knife, as she testified. Assuming for purposes of his argument there is testimony that could be interpreted in this manner, there is no evidence—only his speculation—that Farfan showed her knife or referenced her knife before Lopez threatened her with his knife.

The record contains sufficient evidence for the jury to conclude beyond a reasonable doubt that Lopez did not act in self-defense. Substantial evidence demonstrates that Lopez came around the fence and grabbed Hernandez. After Hernandez pushed Lopez away, and indicated he wanted Lopez to stop, Lopez pulled out the knife and came within an inch of Hernandez. Substantial evidence also demonstrates Lopez pointed the knife at Farfan and Zelaya, although they posed no danger to him. We may not reweigh the evidence or reevaluate witness credibility in a light more favorable to Lopez.

14

## II. The Trial Court Did Not Err in Instructing the Jury, and Lopez Has Not Established Ineffective Assistance of Counsel

### A. CALCRIM No. 3471

At Lopez's trial, the prosecution requested the court instruct the jury with CALCRIM No. 3471, as follows:

"A person who starts a fight has a right to self[-]defense only if:

"1. He actually and in good faith tried to stop fighting;

"AND

"2. He indicated, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wanted to stop fighting and that he had stopped fighting.

"If the defendant meets these requirements, he then had a right to self[-]defense if the opponent continued to fight.

"However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting, communicate the desire to stop to the opponent, or give the opponent a chance to stop fighting."

Lopez objected to the use of CALCRIM No. 3471, arguing in the trial court that a court may give this instruction only if the defense (not the prosecution) requests it, and it is not inconsistent with the defendant's theory of the case. Lopez asserted the instruction was inconsistent with his theory of the case because he disputed he was the initial aggressor who started the fight. The trial court overruled Lopez's objection and gave the instruction, finding that sufficient evidence supported the

prosecution's theory of the case that Lopez was the initial aggressor who started the fight.

On appeal, Lopez contends the trial court erred in instructing the jury with CALCRIM No. 3471 for the reasons he articulated in the trial court. He also asserts the instruction was argumentative because it instructed the jury that he started the fight, usurping the jury's role as factfinder.

"A party is entitled to a requested instruction if it is supported by substantial evidence. [Citation.] Evidence is '[s]ubstantial' for this purpose if it is 'sufficient to "deserve consideration by the jury," that is, evidence that a reasonable jury could find persuasive.' [Citation.] At the same time, instructions *not* supported by substantial evidence should not be given." (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1049-1050.) "It is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129.)

Substantial evidence presented at trial supported CALCRIM No. 3471 because Lopez approached and grabbed Hernandez as Hernandez was walking to Zelaya's car. Hernandez testified unequivocally that Lopez was the initial aggressor who started the fight. Moreover, Farfan and Zelaya testified that Lopez pointed the knife at them, although they had done nothing to justify such an assault.

Lopez argues the trial court was precluded from giving this instruction because he did not request it (he objected to it) and it was inconsistent with his theory of the case. In support of this argument, he cites the Bench Notes to CALCRIM No. 3471 which state, in pertinent part, "The court must instruct on a defense when the defendant requests it and there is substantial evidence

16

supporting the defense. The court has a sua sponte duty to instruct on a defense if there is substantial evidence supporting it and either the defendant is relying on it or it is not inconsistent with the defendant's theory of the case." The Bench Notes further state, "When the court concludes that the defense is supported by substantial evidence and is inconsistent with the defendant's theory of the case, however, it should ascertain whether defendant wishes instruction on this alternate theory." Lopez also referenced these Bench Notes in the trial court, in objecting to the instruction.

We disagree with Lopez's position that the Bench Notes indicate the trial court was precluded from giving CALCRIM No. 3471 under the circumstances of this case. Lopez wanted to present a self-defense theory, and the court granted his request for jury instructions on that defense over the prosecution's objection. The prosecution requested a pinpoint instruction regarding the well-known limitation on self-defense where the defendant is the initial aggressor who starts a physical altercation. As set forth above, substantial evidence supported the instruction and it aligned with the prosecution's theory of the case. Lopez cites no authority, and we are aware of none, holding that a trial court is precluded from instructing with CALCRIM No. 3471 at the prosecution's request when the instruction is supported by substantial evidence. Having elected to pursue a self-defense theory, Lopez is not entitled to veto instructions that are applicable to that defense based on the evidence presented.

Lopez also argues CALCRIM No. 3471 was "argumentative" because it instructed the jury that he started the fight, usurping the jury's role as factfinder. Not so. The trial court instructed the jury with CALCRIM No. 200, which

17

provides, in pertinent part: "You must decide what the facts are. It is up to all of you, and you alone, to decide what happened, based only on the evidence that has been presented to you in this trial. [¶] . . . [¶] Some of these instructions may not apply, depending on your findings about the facts of the case. Do not assume just because I give a particular instruction that I am suggesting anything about the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them." Thus, the jury was informed that if it found Lopez did not start the fight, it should disregard CALCRIM No. 3471 as inapplicable.

The trial court did not err in instructing the jury with CALCRIM No. 3471.

### B. CALCRIM No. 3470

Using CALCRIM No. 3470, which we quoted in full above, the trial court instructed the jury, in pertinent part, "[s]elf-defense is a defense to assault with a deadly weapon (Counts 4, 5, and 6) and the lesser crime of assault." On appeal, Lopez contends the trial court had a sua sponte duty to instruct the jury that self-defense is also a defense to criminal threats.[13]

We agree with the Attorney General that Lopez forfeited this contention on appeal by failing to object to this instruction or request clarifying or amplifying language below. While "[i]n general, a defendant may raise for the first time on appeal instructional error affecting his or her substantial rights," a "party may not argue on appeal that an instruction correct in law was too general or incomplete, and thus needed clarification,

_____

[13] At trial, Lopez presented another defense to the criminal threats charges—that he lacked the specific intent to make a criminal threat due to his intoxication.

18

without first requesting such clarification at trial." (*People v. Buenrostro* (2018) 6 Cal.5th 367, 428 (*Buenrostro*); § 1259.) If Lopez believed his self-defense theory applied to the criminal threats counts, it was incumbent upon him to request a modification of CALCRIM No. 3470 so stating.

In any event, a trial court does not have a sua sponte duty to instruct on a legal doctrine that is not well-established. (*People v. Molano* (2019) 7 Cal.5th 620, 668-669 (*Molano*); *People v. Michaels* (2002) 28 Cal.4th 486, 530.) A " 'legal concept that has been referred to only infrequently, and then with "inadequate elucidation," cannot be considered a general principle of law such that a trial court must include it within jury instructions in the absence of a request.' " (*Molano*, at p. 668.) We are aware of no authority, and Lopez has cited none, holding that self-defense, as defined in CALCRIM No. 3470, is a defense to criminal threats.

In the alternative, Lopez contends defense counsel rendered ineffective assistance in failing to request that the trial court modify CALCRIM No. 3470 to reflect its application to the criminal threats counts. He cannot make the requisite showing of ineffective assistance of counsel: "(1) that defense counsel's performance fell below an objective standard of reasonableness, i.e., that counsel's performance did not meet the standard to be expected of a reasonably competent attorney, and (2) that there is a reasonable probability that defendant would have obtained a more favorable result absent counsel's shortcomings." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003, citing *Strickland v. Washington* (1984) 466 U.S. 668, 687-694.) " 'If the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply

19

could be no satisfactory explanation, the claim must be rejected on appeal.' " (*Cunningham*, at p. 1003.)

Given the lack of authority indicating self-defense is a defense to criminal threats, we cannot conclude defense counsel was incompetent for not requesting the modification to CALCRIM No. 3470 that Lopez suggests here. Moreover, Lopez cannot satisfy the prejudice element of an ineffective assistance of counsel claim. The jury rejected his argument that he acted in self-defense when he pointed the knife at Farfan and Zelaya, and found him guilty of assault with a deadly weapon (after being instructed that self-defense is a defense to this crime). There is no reasonable probability the jury would have acquitted him of criminal threats if the trial court had modified CALCRIM No. 3470 to reflect that it applied to the criminal threats counts. Lopez made the threats at the same time he pointed the knife at Farfan and Zelaya. The jury concluded it was not reasonable for him to believe he "was in imminent danger of suffering bodily injury or was in imminent danger of being touched unlawfully" when it rejected his self-defense theory on the assault with a deadly weapon counts. (CALCRIM No. 3470.)

There was no error here.

## C.    CALCRIM No. 221

Lopez contends CALCRIM No. 221, an instruction pertaining to the deadly or dangerous weapon enhancement on the criminal threats counts (counts 1 & 2) "was confusing and misleading" and implied that the prosecution was not required to prove the other counts (counts 4-6 for assault with a deadly weapon) beyond a reasonable doubt. The contention lacks merit.

During a conference on jury instructions, the trial court specifically asked the parties to review CALCRIM No. 221. After doing so, defense counsel responded, "That looks good."

Using CALCRIM No. 221, the trial court instructed the jury as follows:

"The People are required to prove the allegations, as to Counts 1 and 2, beyond a reasonable doubt.

"Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the allegation is true. The evidence does not need to eliminate all possible doubt because everything in life is open to some possible or imaginary doubt.

"In deciding whether the People have proved the allegation beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received during this trial. Unless the evidence proves the allegation beyond a reasonable doubt, you must find that the allegation has not been proved and disregard it completely."

Immediately after the trial court read this instruction to the jury, the prosecutor requested to approach the court. The following exchange occurred at sidebar:

"[The prosecutor]: I apologize, Your Honor. I should have caught it before. It appears [CALCRIM No.] 221, it says that they have to find beyond a reasonable doubt in Counts 1 and 2. It does not say 4, 5, 6.

"The Court: The special allegation is only alleged as to 1 and 2, I believe.

"[The prosecutor]: Is that only for the special allegation? I apologize.

"The Court: The Court has shown the parties the felony information in this case that the special allegations only apply to

21

Count 1 and 2." Neither side requested any modification to the instruction.

On appeal, Lopez argues the jury would not have known CALCRIM No. 221 applied to the special allegations on the deadly or dangerous weapon enhancement. He posits the jury could have believed "allegations" referred to all charges or elements of the charged offenses, and the jury therefore would have interpreted this instruction to mean the prosecution only needed to prove counts 1 and 2 beyond a reasonable doubt, and not counts 4, 5, and 6. He asserts the trial court should have inserted the word "enhancement" before the word "allegations" in CALCRIM No. 221.

We agree with the Attorney General that Lopez forfeited this contention on appeal by failing to object below or request an additional or clarifying instruction. (See *People v. Dennis* (1998) 17 Cal.4th 468, 514; *Buenrostro, supra*, 6 Cal.5th at p. 428.) He again asserts ineffective assistance of counsel, which he cannot establish for the reasons set forth below.

Considering the entire charge, as we are required to do when reviewing a claim of instructional error, we have no reason to believe there was any confusion that affected the jury's verdict. (See *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248 [" ' "the correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction" ' "].)

CALCRIM No. 220, which the trial court read to the jury right before CALCRIM No. 221, states in pertinent part, "Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt." Thus, there is no reason to believe the jury did not understand the prosecution was

22

required to prove each element of each charge beyond a reasonable doubt. (See also CALCRIM No. 355 [defendant "may rely on the state of the evidence and argue that the People have failed to prove the charges beyond a reasonable doubt"]; CALCRIM No. 359 ["You may not convict the defendant unless the People have proved his guilt beyond a reasonable doubt"].) During argument, the prosecutor explained to the jury that the prosecution must prove each element of the charged offenses beyond a reasonable doubt.

Moreover, the trial court and the prosecutor consistently referenced the term "allegation," as used in the now-challenged CALCRIM No. 221, to refer to the deadly or dangerous weapon enhancement allegations. CALCRIM No. 3145, which the trial court read to the jury after CALCRIM No. 221, states in pertinent part: "If you find the defendant guilty of the crimes charged in Counts 1 and 2, or the lesser crimes of Attempted Criminal Threats, you must then decide whether, for each crime, the People have proved the additional *allegation* that the defendant personally used a deadly or dangerous weapon during the commission of that crime. You must decide whether the People have proved this *allegation* for each crime and return a separate finding for each crime." (Italics added.)

During argument, the prosecutor stated: "And the last of the laws that we're talking about, it's technically not a crime by itself, it's what's called an *allegation*. It goes along with the crime, okay. It gets attached to a crime. [¶] . . . [¶] So meaning basically this: Let's say you are back in the jury room, you are voting on criminal threats. Let's say you all decide, yeah, he is guilty of criminal threats. You then move on to this *allegation* which is attached to the criminal threats and you say whether or

23

not you think it was true that he used a deadly weapon, okay. I hope that makes sense." (Italics added.)

It was clear from the trial court's instructions and the prosecutor's argument that "allegations," as used in CALCRIM No. 221, referred to the deadly or dangerous weapon enhancement allegations on counts 1 and 2. Moreover, it was clear from the jury instructions as a whole that the prosecution was required to prove each element of each charge beyond a reasonable doubt for the jury to return a guilty verdict. CALCRIM No. 221 was not confusing or misleading, and there is no reason to believe the jury misconstrued it in the manner Lopez suggests. Accordingly, Lopez cannot show that the jury would have reached a verdict more favorable to him if the trial court had inserted the word "enhancement" before the word "allegations" in CALCRIM No. 221. His ineffective assistance of counsel claim fails.

## III. The Trial Court Did Not Commit Reversible Error in Responding to the Jury's Question

### A. Question and Response

During deliberations, the jury submitted the following question to the trial court: "We would like to confirm whether having a knife in a pocket while committing an assault is considered an assault with a deadly weapon, or does it need to be out and in his hand for it to be assault with a deadly weapon?"

The following exchange occurred between the trial court and the parties regarding the appropriate response to the jury's question:

"[Defense counsel]: I think element no. 4, when he acted he had the present ability to apply force with the weapon, I think it answers that question.

24

"The Court: I would just refer them back to the jury instruction. I don't know if they are making a distinction as to an assault at a point in time or they believe the weapon wasn't out. I don't remember hearing testimony about [*sic*] other than coming out of the pocket. So I don't know if they are making a finding regarding that, but it's their determination. I mean, you certainly could have assault with a deadly weapon with it in the pocket depending on a whole bunch of factors. What they have to find is that all the other links have been met, so what I would say is --

"[Defense counsel]: Refer to the elements of the charge.

"The Court: Refer back to the instruction on assault with a deadly weapon instruction [*sic*], and give me a second to pull it up.

"[Defense counsel]: [CALCRIM No.] 875.

"The Court: [CALCRIM No.] 875. [¶] Does either side want to be heard further?

"[The prosecutor]: No, Your Honor.

"[Defense counsel]: No, Your Honor.

"The Court: All right. Here is what I wrote: [¶] Please see the definition for the crime of assault with a deadly weapon No. 875 in your instruction package. [¶] Anything else?

"[Defense counsel]: No.

"[The prosecutor]: No, Your Honor." Shortly after the trial court responded to the question, the jury returned the guilty verdicts.

CALCRIM No. 875, as given in this case and referenced in response to the jury's question, provides as follows:

25

"The defendant is charged in Counts 4, 5, and 6 with assault with a deadly weapon other than a firearm in violation of Penal Code section 245.

"To prove that the defendant is guilty of this crime, the People must prove that:

"1.  The defendant did an act with a deadly weapon other than a firearm that by its nature would directly and probably result in the application of force to a person;

"2.  The defendant did that act willfully;

"3.  When the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone;

"4.  When the defendant acted, he had the present ability to apply force with a deadly weapon other than a firearm to a person;

"AND

"The defendant did not act in self-defense.

"Someone commits an act *willfully* when he or she does it willingly or on purpose.  It is not required that he or she intend to break the law, hurt someone else, or gain any advantage.

"The touching can be done indirectly by causing an object to touch the other person.

"The People are not required to prove that the defendant actually touched someone.

"The People are not required to prove that the defendant actually intended to use force against someone when he acted.

"No one needs to actually have been injured by defendant's act.  But if someone was injured, you may consider that fact, along with all the other evidence, in deciding whether the

26

defendant committed an assault, and if so, what kind of assault it was.

"Voluntary intoxication is not a defense to assault.

"*Great bodily injury* means significant or substantial physical injury. It is an injury that is greater than moderate or moderate harm.

"A *deadly weapon other than a firearm* is any object, instrument, or weapon that is inherently deadly or one that is used in such a way that it is capable of causing and likely to cause death or great bodily injury." The instructions did not define "inherently deadly."

During argument to the jury, the prosecutor stated, without objection by the defense, that "knives are inherently dangerous by their very nature, by their very design, they can be used for other things, sure, but their very nature is dangerous."[14]

Lopez contends, for the first time on appeal, that the trial court erred in responding to the jury's question by referring the jury back to CALCRIM No. 875. He argues, and the Attorney General acknowledges, that CALCRIM No. 875 erroneously permitted the jury to consider the knife as an *inherently* deadly weapon. (See *People v. Aledamat* (2019) 8 Cal.5th 1, 3, 6 (*Aledamat*) ["Because a knife can be, and usually is, used for innocent purposes, it is not among the few objects that are inherently deadly weapons"].)

Lopez argues that the only valid theory of a deadly weapon in this case—"one that is used in such a way that it is capable of causing and likely to cause death or great bodily injury"

---

[14] Lopez made clear in his appellate briefing that he "is not arguing for a reversal on grounds of prosecutorial misconduct."

(CALCRIM No. 875)—"was eliminated by the jury question itself." He asserts that, based on the jury's question and the trial court's referral back to CALCRIM No. 875 in response, there was a "possibility that the jury could have concluded that a knife in his pocket could constitute the 'present ability to apply force with a deadly weapon.' " He contends the error prejudicially affected the guilty verdicts on the assault with a deadly weapon counts as well as the deadly or dangerous weapon enhancement on the criminal threats counts. We agree with the Attorney General that any error was harmless in this case under our Supreme Court's rationale in *Aledamat*, as explained below.

### B. *Aledamat*

In *Aledamat*, the defendant, like Lopez, was charged with assault with a deadly weapon (§ 245, subd. (a)(1)) and making a criminal threat (§ 422); and on the threat charge, there was an allegation that the defendant used a deadly and dangerous weapon (§ 12022, subd. (b)), a box cutter. The facts of the case, in pertinent part, were that the " 'defendant pulled a box cutter out of his pocket and extended the blade; from three or four feet away, defendant thrust the blade at the [male victim] at waist level, saying, "I'll kill you." ' " (*Aledamat, supra*, 8 Cal.5th at p. 4.)

The Supreme Court in *Aledamat* explained that the trial court instructed the jury with CALCRIM No. 875, "present[ing] the jury with two possible theories of guilt: (1) that the box cutter was inherently deadly, and (2) that the defendant used the box cutter in a deadly way. The first of these theories was erroneous under the facts. A box cutter is, as a matter of law, not inherently deadly. The second theory was correct." (*Aledamat, supra*, 8 Cal.5th at p. 3.)

As in this case, the jury in *Aledamat* was instructed with CALCRIM No. 3145 regarding personal use of a deadly weapon. (*Aledamat, supra*, 8 Cal.5th at pp. 4-5.) As given in *Aledamat*, the instruction stated, in pertinent part: " '[A] deadly or dangerous weapon is any object, instrument, or weapon that is inherently dangerous, . . . or one that is used in such a way that it is capable of causing or likely to cause death or great bodily injury. In deciding whether an object is a deadly weapon, consider all of the surrounding circumstances including when and where the object was possessed and any other evidence that indicates whether the object would be used for a dangerous rather than a harmless purpose.' " (*Ibid*.)[15] And, as in this case, the prosecutor argued to the jury in *Aledamat* that "the box cutter was an 'inherently deadly weapon.' " (*Id*. at p. 5.) The jury found the defendant guilty of assault with a deadly weapon and criminal threats and found the weapon enhancement to be true.

The Supreme Court concluded that the error in instructing the jury on the inherently deadly weapon theory was harmless beyond a reasonable doubt under the test in *Chapman v. California* (1967) 386 U.S. 18, as it was "clear the error did not contribute to the verdict." (*Aledamat, supra*, 8 Cal.5th at p. 13.) As set forth above, CALCRIM Nos. 875 and 3145 define a deadly weapon as one that is inherently deadly *or* one that is used in such a way that it is capable of causing and likely to cause death

---

[15] The language in the version of CALCRIM No. 3145 given in this case was a bit different: "In deciding whether an object is a deadly weapon, consider all the circumstances, including when and where the object was possessed and *where the person who possessed the object was going*." (Italics added to show difference.)

or great bodily injury.  The Supreme Court reasoned it was "unlikely" the jury "view[ed] the instructions" to "permit such separation" between the two ways of finding a deadly weapon, despite the instructions' use of "the disjunctive 'or.' " (*Id*. at p. 13.)  The Court pointed out that CALCRIM No. 3145 required the jury "to consider all of the circumstances in deciding whether the object was a deadly weapon, *either* inherently *or* as used.  The jury would likely view the 'inherently deadly' language in light of this additional instruction that it had to consider all the circumstances.  Given this additional instruction, it seems unlikely the jury would simply view the box cutter as inherently deadly without considering the circumstances, including how defendant used it." (*Id*. at p. 14.)

The Supreme Court also referenced the parties' arguments to the jury, noting the box cutter's status as a deadly weapon was not a point of contention at trial.  Although the prosecutor stated during argument that the box cutter was inherently deadly, defense counsel did not concede or contest the point.  "Defense counsel argued that defendant did not use the box cutter in a way that would probably result in the application of force, that is, that defendant did not assault the victim at all—an argument the jury necessarily rejected when it found defendant guilty of that crime.  But counsel never argued that, if [the defendant] did assault the victim with the box cutter, the box cutter was not a deadly weapon." (*Aledamat, supra*, 8 Cal.5th at p. 14.)  The Court reasoned defense counsel "could readily believe it would be pointless for him to argue that even if (contrary to the argument counsel did make) the jury found defendant assaulted the victim with the box cutter, it was not a deadly weapon." (*Ibid*.)  While a "box cutter is not inherently deadly because it is not *designed* for

that purpose," if it is "used to assault someone, i.e., used as a *weapon*, a box cutter *is* potentially deadly even if not designed for that purpose." (*Ibid*.)

The Supreme Court also set forth another way to determine if the error is harmless beyond a reasonable doubt: "The reviewing court examines what the jury necessarily did find and asks whether it would be impossible, on the evidence, for the jury to find *that* without *also* finding the missing fact as well"—the missing fact here being that the weapon was used in such a way that it is capable of causing and likely to cause death or great bodily injury. (*Aledamat*, *supra*, 8 Cal.5th at p. 15.) The Court explained that "under the instructions, the jury necessarily found the following: (1) defendant did an act with a deadly weapon (either inherently or as used) that by its nature would directly and probably result in the application of force; (2) defendant was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone; and (3) defendant had the present ability to apply force with a deadly weapon to a person." (*Ibid*.) If the jury "applied its common understanding [of the term inherently deadly] to find the box cutter deadly because it is sharp and used for cutting," the jury "would necessarily find the box cutter deadly in the colloquial sense of the term—i.e., readily capable of inflicting deadly harm—and that defendant used it as a weapon." (*Ibid*.) " 'No reasonable jury that made all of these findings could have failed to find' that defendant used the box cutter in a way that is capable of causing or likely to cause death or great bodily injury." (*Ibid*.)

31

## C.    Analysis

Lopez argues the trial court committed *reversible* error in responding to the jury's question because the court referred the jury to an instruction containing erroneous language. The erroneous language in the instruction, however, was unrelated to the jury's question. Even if the jury found the knife was inherently deadly, to find Lopez guilty of assault with a deadly weapon, the jury still had to find he "did an act" with the knife "that by its nature would directly and probably result in the application of force to a person," as set forth in CALCRIM No. 875. Moreover, to find Lopez personally used a deadly or dangerous weapon within the meaning of the enhancement, the jury had to find he intentionally "display[ed] the weapon in a menacing manner," as set forth in CALCRIM No. 3145. Having a weapon in a pocket, and doing no act with that weapon, while committing an assault and making criminal threats would not satisfy either of these elements, regardless of whether the weapon was inherently dangerous.

Presumably, the jury asked the question because the knife was not visible on the bar's surveillance video. Having received an answer to the question, we have no reason to believe the jury failed to apply the trial court's instructions. Doing so, the jury necessarily found Lopez *used* the knife. At trial, Lopez challenged the credibility of the evidence indicating he had a knife, and the evidence indicating he did not act in self-defense. He did not argue, however, that if he pulled out the knife, he did not use it "in such a way that it is capable of causing and likely to cause death or great bodily injury." (CALCRIM No. 875.) Nor could he. The testimony was that he pulled out the knife during a physical altercation with Hernandez, and then moved within an

32

inch of Hernandez; and that he pointed the knife at Farfan and Zelaya while threating to kill them, rape Farfan, and rape Zelaya's mother.

"[A]fter examining the entire cause, including the evidence, and considering all relevant circumstances," we conclude any error was harmless beyond a reasonable doubt. (See *Aledamat*, *supra*, 8 Cal.5th at p. 13.) The jury's question was unrelated to whether the knife was a deadly weapon. And, having found Lopez guilty of assault with a deadly weapon under the elements of the crime set forth in CALCRIM No. 875, and having found he personally used the knife by displaying it in a menacing manner, it is inconceivable the jury did not find the knife was used in such a way that it was capable and likely to cause death or great bodily injury, based on the facts and circumstances of this case.[16]

## IV. Lopez Forfeited His Contention Regarding Imposition of the Restitution Fine and Assessments, and He Has Not Established Ineffective Assistance of Counsel

Citing *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), Lopez contends the trial court erred when it imposed a restitution fine and assessments without a hearing to determine his ability to pay. The Attorney General argues Lopez forfeited this contention by failing to raise an objection in the trial court to the imposition of the fine and assessments or request the court consider his ability to pay them. We agree with the Attorney General.

---

[16] We reject Lopez's claim of cumulative error, as there was only one error that we conclude was harmless beyond a reasonable doubt.

The trial court imposed the fine and assessments on March 11, 2020, more than a year after *Dueñas* was decided. Lopez did not argue he was entitled to an ability-to-pay hearing either before or at that hearing. Nor did he make such a claim in the following year when he appeared at three more hearings before he ultimately surrendered to custody on May 24, 2021. Lopez forfeited any contentions about the fine and assessments by failing to raise them in the trial court. (See, e.g., *People v. Avila* (2009) 46 Cal.4th 680, 729 [rejecting argument that, because the defendant did not have the ability to pay, imposition of a restitution fine in excess of the minimum resulted in an unauthorized sentence not subject to the forfeiture rule]; *People v. Trujillo* (2015) 60 Cal.4th 850, 859 [the constitutional nature of the defendant's claim regarding his ability to pay did not justify deviation from the forfeiture rule].)

Lopez argues his trial counsel rendered ineffective assistance by failing to object. He cannot make the requisite showing: "(1) that defense counsel's performance fell below an objective standard of reasonableness, i.e., that counsel's performance did not meet the standard to be expected of a reasonably competent attorney, and (2) that there is a reasonable probability that defendant would have obtained a more favorable result absent counsel's shortcomings." (*People v. Cunningham*, *supra*, 25 Cal.4th at p. 1003, citing *Strickland v. Washington*, *supra*, 466 U.S. at pp. 687-694.) " 'If the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal.' " (*Cunningham*, at p. 1003.)

The record before us does not demonstrate that Lopez had an inability to pay or that there was no valid reason trial counsel did not object to the fines and assessments. The court imposed the minimum restitution fine of $300 under section 1202.4, subdivision (b), $200 in court operations assessments ($40 per conviction), as required under section 1465.8; and $150 in court facilities assessments ($30 per conviction), as required under Government Code section 70373, for a total of $650. The record shows Lopez worked multiple jobs as a chef during the 11 months he was released on his own recognizance, after the trial court announced the fine and assessments. Based on the record before us, Lopez cannot establish ineffective assistance of counsel because he cannot show (1) there could be no satisfactory explanation for his counsel's decision not to object to the fines and assessments (i.e., that he *did* have the ability to pay) or (2) the outcome would have been more favorable if his counsel objected.

We note that the abstract of judgment and minute order incorrectly state that the trial court imposed $120 in court operations assessments and $90 in court facilities assessments, although the reporter's transcript of the March 11, 2020 hearing clearly states the court imposed $200 in court operations assessments ($40 for each of the five convictions) and $150 in court facilities assessments ($30 for each of the five convictions). The court did not make any changes to Lopez's sentence or the fines and assessments when Lopez surrendered to custody on May 24, 2021.

The abstract of judgment or minute order "is not the judgment of conviction; it does not control if different from the trial court's oral judgment and may not add to or modify the judgment it purports to digest or summarize." (*People v. Mitchell*

35

(2001) 26 Cal.4th 181, 185.) We order the trial court to correct the clerical errors reflected in the March 11, 2020 minute order, the March 20, 2020 abstract of judgment, and the May 25, 2021 amended abstract of judgment.[17]

## DISPOSITION

The trial court is directed to correct the March 11, 2020 minute order, the March 20, 2020 abstract of judgment, and the May 25, 2021 amended abstract of judgment to reflect the imposition of $200 in court operations assessments under Penal Code section 1465.8 and $150 in court facilities assessments under Government Code section 70373. As so modified, the judgment is affirmed. The clerk of the superior court is directed

---

[17] In his opening appellate brief, Lopez contended the matter should be remanded for the trial court to determine whether to dismiss the weapon enhancements in light of Senate Bill No. 81's (2021-2022 Reg. Sess.; Stats. 2021, ch. 721, § 1) amendments to section 1385, enacted after his sentencing hearing. These amendments only apply to "sentencings occurring after January 1, 2022." (§ 1385, subd. (c)(7).) In his reply brief, Lopez conceded the amendments to section 1385 "will only apply if this case is remanded to the trial court on one of the grounds asserted in appellant's briefs." No such ground warrants a remand in this case.

to prepare an amended abstract of judgment and to forward it to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED


CHANEY, J.


We concur:


ROTHSCHILD, P. J.


BENDIX, J.


37